**Guy GIBBONS, et al., Plaintiffs,**

v.

**TENNECO, INC., Defendant.**

**Civ. A. No. 82–231.**

United States District Court,
E.D. Kentucky,
Ashland.

Sept. 7, 1988.

Phillip Bruce Leslie, McBrayer, McGinnis, Leslie & Kirkland, Clifford R. Duvall, Greenup, Ky., Garis L. Pruitt, Pruitt & Mussetter, Catlettsburg, Ky., for plaintiffs.

David O. Welch, Welch and Purdom, Ashland, Ky., William P. Curlin, Jr., Hazelrigg & Cox, Frankfort, Ky., for defendant.

## MEMORANDUM OPINION

WILHOIT, District Judge.

This matter is before the Court upon defendant's motion for judgment n.o.v. or, in the alternative, for a new trial and defendant's motion for oral argument. The parties have filed responses and replies to both motions.

## INTRODUCTION

The plaintiffs, Guy and Carolyn Gibbons, intervened in this action against the defendant, Tenneco, Inc., to enforce a so-called "coal clause" contained in the deed of an approximately 300 acre tract of land (hereinafter called the "Justice tract") located in Greenup County, Kentucky. A three-day trial began on May 16, 1988 and the jury returned a verdict for the plaintiffs in the amount of $140,000. The Court entered judgment on May 26, 1988.

## FACTS

Although this action was originally filed in this Court on December 16, 1982, it has become a procedural nightmare of monumental proportions. The ambiguous wording of the "coal clause" and the shifting of plaintiffs has been a thorn in the flesh that is only now beginning to heal. A full understanding of this action cannot be realized without revisiting its procedural history.

The genesis of this controversy was on March 21, 1950. The defendant Tenneco entered into a right-of-way agreement with the plaintiffs' predecessors in title, Phillip and LaRue Justice. Tenneco wanted to run a gas pipeline through the Justice property consisting of 300 acres. While the value of the surface rights could readily be ascertained, the value of any coal reserves under the proposed path of the pipeline was far less certain. However, at that time no coal mining had been conducted on the property and the Justices were probably unsure as to *when* they would conduct mining operations on the property. In response to these facts, Tenneco had the option of setting a fair and reasonable value on the unmined coal, pay for the surface *and* the coal, and forever extinguish any right to payment for the coal.

Tenneco did not choose this option. Instead of paying cash to the Justices for the value of the right of way, Tenneco chose an option that might relieve it of any necessity of *ever* having to pay for the coal. This option was utilized in the form of a so-called "coal clause" in the 1950 agreement with the Justices and with over seventy other landowners similarly situated. The following is a complete statement of the "coal clause" in question:

> "In the event coal is removed by strip mining or any other method, the undersigned, his heirs or assigns, will not remove, mine or disturb that part of said coal which in the judgment of the Tennessee Gas Transmission Company is necessary for the proper support and protection of any pipe lines laid under the written right of way. The Tennessee Gas Transmission Company agrees to pay and the undersigned agrees to accept the current fair value as payment for the coal left undisturbed under this agreement."

(Right of Way Agreement, March 21, 1950). Apparently, Tenneco hoped that the Justices, their successors in title, and other landowners who entered into a similar agreement would not choose to trigger this

clause by mining coal on their respective properties. The "coal clause" is fraught with ambiguity. Indeed, it almost guaranteed a lawsuit.

The next problem in this action arose because of the failure of Tenneco to define the location of the pipeline in the 1950 agreement. The pipeline was constructed on the property shortly after the agreement was signed. In 1976, Tenneco's right-of-way agent, Mr. James Stuart, approached Sam and Neva Picklesimer, the Justices' successors in title, about defining the location of the pipeline. At that time, no mention was made of the "coal clause" and the Picklesimers were told that signing the Partial Release of Easement would cost them nothing and would be beneficial to them by releasing the remainder of the property.[1]

On December 18, 1979, Gibbons Construction Company, Inc. ("GCC") purchased the Justice tract. The plaintiff Guy Gibbons was a principal shareholder and officer of GCC. Although originally a construction company, GCC became involved in coal mining operations and obtained mining permits for only 13 acres of the entire Justice tract. Paul Coffey Construction Company was employed to conduct the mining operations. The mining permits enabled GCC to remove the *Princess No. 3* seam of coal and to conduct strip mining operations *without* blasting. Although the plaintiff Guy Gibbons was uncertain in his testimony as to the exact amount of coal removed, some coal was removed in 1981 and 1982.

GCC did not attempt to mine all the coal adjacent to the pipeline easement that could be commercially mined but for the presence of the pipeline. It could be inferred that the mining was done for the purpose of "mining the covenant" rather than the coal. Evidently, GCC believed that its actions in attempting to mine *some* of the coal on the Justice tract entitled it to receive compensation for *all* coal that could not be mined but for the pipeline.[2]

On December 1, 1982, GCC filed an action against Tenneco in Greenup Circuit Court for damages under the "coal clause". Tenneco removed the case to this Court on December 16, 1982. While this action was proceeding, GCC filed a Chapter 11 bankruptcy petition on April 5, 1983. The Court did not become aware of the petition until Tenneco filed a motion to dismiss on October 24, 1983. As a result of this information, the Court transferred this action to the bankruptcy court on November 14, 1983.[3]

While in bankruptcy court, one of GCC's creditors, the Bank of Ashland, filed a motion for relief from the automatic stay so that it could foreclose on its mortgage on the Justice tract. On October 25, 1983, the bankruptcy court lifted the automatic stay for the purpose of selling the Justice tract. The bank foreclosed on the property on June 26, 1984. Unable to obtain a suitable price for the property, the bank bid in the property at the foreclosure sale for $50,000. A Master Commissioner's Deed was executed and delivered to the Bank of Ash-

---

**1.** Because of some language in the 1976 Partial Release of Easement, the defendant believed that it may have been released from any liability and Tenneco amended its answers to interrogatories to raise the issue. Extensive briefing was conducted on this issue including an evidentiary hearing before the Magistrate. This issue was ultimately found to lack merit.

**2.** In opening statement, plaintiffs' counsel indicated that mining operations could not be conducted any closer than 500 feet because of a Kentucky regulation prohibiting blasting at any closer distance to a gas pipeline. However, the seam of coal that was being removed did not require blasting and GCC had not applied to obtain a permit to conduct blasting.

**3.** An additional problem arose from the bankruptcy of GCC. Because of a lack of money to reclaim the land mined by GCC, civil penalties were assessed against GCC and the right of GCC and its officers to obtain future mining permits was suspended. Consequently, Guy Gibbons cannot show any intent to mine by obtaining a mining permit in his own name. However, it may be possible for Carolyn Gibbons to obtain a mining permit or for Guy Gibbons to obtain a permit by leasing the coal to another individual who may do the actual mining. The landowner must show a bona fide intent to mine by obtaining a mining permit in his or her own name or through a third party. In addition, the landowner must conduct enough mining operations to convince the trier of fact of an intent to mine coal up to the boundaries of the pipeline.

land on September 28, 1984. The deed made no mention of the pending litigation against Tenneco and there was no formal assignment of GCC's *chose in action* to the Bank of Ashland.

In addition to the debt owed by GCC, Guy and Carolyn Gibbons were personally liable for a deficiency in the amount of $20,878.82. To satisfy this deficiency, the Gibbons agreed to purchase the Justice tract from the bank for $69,278.35 and the bank conveyed the property to the Gibbons on September 28, 1984. Again, the deed did not mention the pending lawsuit against Tenneco. However, an express assignment of the bank's right to collect on its deficiency judgment was made to Guy Gibbons on February 22, 1985. Of course, there was no mention of GCC's *chose in action*, i.e., its right to collect under the "coal clause" from Tenneco.

Armed with the deed to the Justice tract, the Gibbons filed an intervening complaint with the bankruptcy court on May 1, 1985. At a hearing before the bankruptcy court on June 12, 1985, the Gibbons argued that the right to collect under the "coal clause" passed to them as a matter of law because this was a covenant that ran with the land and they were now the owners of the unmined coal beneath the pipeline. The bankruptcy court agreed with the Gibbons and held that

> ... the claim set forth in the complaint has passed by operation of law to the intervening plaintiffs, Guy E. Gibbons and Carolyn Gibbons, his wife, and that they are now the real parties in interest entitled to prosecute the claim set out in the complaint.

(Bankruptcy Order, June 26, 1985, p. 2). The bankruptcy court focused its decision upon the fact that the Gibbons, as successors in interest, now had possession of the

unmined coal beneath the pipeline. (Transcript, June 12, 1985, pp. 42–50.) Since there had been no separation of mineral from the fee simple right, the bankruptcy court believed that the cause of action for the coal passed to the Gibbons.[4] *Id.*

On September 6, 1985, the Gibbons moved to transfer this action back to district court. The bankruptcy court overruled the motion and the Gibbons filed a notice of appeal with this Court. At the time the appeal was considered, this action appeared to be a non-core unrelated proceeding over which the bankruptcy court had no jurisdiction. However, since the bankruptcy court had no procedural mechanism to transfer this action to district court, on December 10, 1986, this Court took jurisdiction of this action by withdrawing the previous order referring this action to bankruptcy court.

## THE TRIAL

After becoming sidetracked on a number of issues,[5] the trial began on May 16, 1988. At the beginning, the parties brought up the issue of whether GCC would be mentioned as a plaintiff. Although the bankruptcy court allowed GCC to remain a party for purposes of maintaining a claim for lost profits,[6] GCC no longer actively pursued this action after the case was redocketed in this Court. Apparently, the two attorney's representing GCC were no longer being paid as evidenced by their notices of intent to assert attorney's fee lien filed on July 10, 1987 and May 19, 1988. Moreover, the limitation of GCC's claim to lost profits probably decreased GCC's chances for a successful outcome on its remaining claim in light of the bankruptcy court's finding that the Gibbons were the real par-

---

**4.** For the reasons given in the discussion portion of this opinion, we believe that the bankruptcy court was incorrect in its decision. While it is true that the *covenant* ran with the land and passed to the Gibbons as a matter of law, the value of the coal triggered by the mining operations of GCC became a chose in action when Tenneco breached the covenant by failing to pay GCC. The focus of the Gibbons attempt to intervene should have been on the right to

recover for the coal and not on the coal itself. The coal clause was triggered by the activities of GCC and was breached by the refusal of Tenneco to pay for the coal while GCC owned the Justice tract.

**5.** *See supra* note 1 and accompanying text.

**6.** (Bankruptcy Order, June 26, 1985).

ties in interest for purposes of the unmined coal beneath the pipeline.

Although Tenneco raised the issue of GCC being the real party in interest at trial, neither party adequately discussed the bankruptcy court's decision on this matter or whether the bankruptcy court may have been in error. It was not until after trial that the Court, in its own review of the record, closely examined the reasoning of the bankruptcy court in allowing the Gibbons to file an intervening complaint.

During the presentation of the plaintiff's case, a number of issues were troubling to the court. First, although the pipeline traversed almost the entire length of the Justice tract, GCC had only attempted to mine 13 acres. Second, although the right-of-way was limited to an area 100 feet in width, the Gibbons alleged an inability to mine any closer than 500 feet because of a Kentucky regulation preventing any blasting at any closer distance to the pipeline. 405 KAR 1:090. GCC did not apply for, nor did it obtain a permit to conduct blasting to remove the Princess No. 3 seam of coal. Third, in this action the Gibbons were attempting to recover for the Princess No. 3, Tom Cooper, and Fire Clay seams of coal even though it was permitted to mine only the Princess No. 3 seam. Fourth, mining operations were conducted on only a small portion of the 300 acre Justice tract and the Gibbons failed to offer any explanation as to why the land adjacent to entire length of the pipeline was not mined.

The Court wrestled mightily with these issues during the trial. Despite the continued insistence of Tenneco that it was entitled to a directed verdict on these issues, the motion was sustained on only one issue and held that the Gibbons could only recover for the Princess No. 3 seam of coal. Additionally, the Court agreed with the plaintiffs' motion for a directed verdict on the issue of whether the "current" value of the coal included the royalty value in 1981–82 when coal was removed by GCC or the value in 1950 when the original agreement was signed by the Justices.

After much further reflection, the Court should have sustained the defendant's motion for a directed verdict. For the reasons stated below, GCC is the real party in interest and the Gibbons can assert no claim under the "coal clause" for coal mined in 1981–1982 by GCC. Since this action is a case of first impression, we will attempt to resolve some of the legal issues involved in contracts or deeds containing a provision similar to the "coal clause" in the case at bar. In addition, because the bankruptcy proceedings of GCC are still pending, we will attempt to clarify the issues that may be of importance to the bankruptcy court.

## DISCUSSION

A party may file a motion for judgment notwithstanding the verdict ("judgment n. o. v.") if such party moved for a directed verdict at the close of the evidence and such motion is filed within 10 days after entry of judgment. Fed.R.Civ.P. 50(b). If the motion for judgment n. o. v. is granted, then "the court shall also rule on the motion for new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for new trial." Rule 50(c). Findings of fact and conclusions of law are not required in ruling upon a judgment n. o. v. However, in complex cases it is the better practice "to delineate with specificity" the reasons for the grant of judgment n. o. v. *Morelock v. NCR Corporation*, 586 F.2d 1096, 1099 n. 5 (6th Cir. 1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979).

The standard for granting a judgment n. o. v. is expressed by the Sixth Circuit Court of Appeals in the following manner: "[A] judgment n. o. v. may not be granted unless reasonable minds could not differ as to the conclusions to be drawn from the evidence." *Id.* at 1104 n. 10.

In considering a motion for judgment n. o. v., the Court must decide "whether there is sufficient evidence to raise a question of fact for the jury." *Id.* at 1104.

This determination is one of law to be made by the trial court in the first instance. In determining whether the evidence is sufficient, the trial court may neither weigh the evidence, pass on the credibility of witnesses nor substitute its judgment for that of the jury. Rather, the evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor. If after thus viewing the evidence, the trial court is of the opinion that it points strongly in favor of the movant that reasonable minds could not come to a different conclusion, then the motion should be granted.

*Id.* at 1104–05 (citations omitted).

The defendant has asserted at least seven grounds for its motion. However, the issue of whether the Gibbons triggered the "coal clause" and may maintain an action against Tenneco is dispositive of the plaintiffs' claim. Several of the remaining issues will be addressed for the purpose of clarifying matters for any future action by the bankruptcy court regarding GCC and for the seventy other landowners who possess deeds with a similar coal clause.

At the beginning of trial, the parties posed the question of whether GCC would be mentioned as a plaintiff to the jury. In hindsight, it would have been better to continue the trial and resolve that issue before proceeding further. If the bankruptcy court's reasoning in allowing the Gibbons to intervene had been examined at that time, the trial would have been unnecessary. However, the failure to do so did allow the Court to obtain a better overview of the issues involved and this knowledge should be helpful to future jurists presented with the same problem.

At a hearing before the bankruptcy court, plaintiffs' counsel stated that "our position is that we own it [right to payment under the "coal clause"] because it's a covenant running with the land ... and that covenant ... gives rise to whatever cause of action may exist...." (Bankruptcy Hearing Transcript, June 12, 1985, p. 35).

The bankruptcy court adopted this reasoning as follows:

"This coal has never been severed from the surface, there's never been a separation of the mineral and the fee simple right. I think that I'm compelled to rule on these facts that this cause of action for the coal itself passed with the deed and the successor in interest here bought the coal, bought the property at the foreclosure sale is the one that is the party insofar as the claim to this coal goes.

....

.... The cause of action to the coal itself has to go with the land."

*Id.* at 42–43; *see also* text *supra* at pages 6–7.

■ While plaintiffs' counsel is quite correct that the "coal clause" is a covenant that runs with the land, upon the breach of a covenant, it becomes a *"chose in action"* that does *not* run with land. *See* 20 Am. Jur.2d *Covenants, Conditions, and Restrictions* Section 21, p. 593 (1965); *see also Fudge v. Hogge,* 323 S.W.2d 663, 667 (Tex.Civ.App.1959); *Railway Company v. Willis,* 200 Va. 299, 105 S.E.2d 833, 837 (1958); *Creson v. Scott,* 275 S.W.2d 406, 408 (Ky.1955); *Wallace v. Paulus Brothers Packing Co.,* 191 Or. 564, 231 P.2d 417, 419 (1951). "A chose in action has been defined as a personal right not reduced into possession, but recoverable by a suit at law." *Button v. Drake,* 302 Ky. 517, 195 S.W.2d 66, 69 (1946); 63A Am.Jur.2d *Property* Section 25, p. 256 (1984).

While a chose in action does not run with land, it can be specifically assigned. *McPhail v. John Hancock Mut. Life Ins. Co.,* 108 F.Supp. 902, 906 (W.D.Ky.1952); *Wallace,* 231 P.2d at 419; *Roberts v. Powers,* 303 Ky. 489, 198 S.W.2d 58, 59–60 (1946). Kentucky does not require any particular form for the assignment. However, the assignment must sufficiently identify the property and show the intention of the owner to transfer the chose in action. *McPhail,* 108 F.Supp. at 906; *Roberts,* 198 S.W.2d at 60. After exhaustively examining every deed of conveyance of the Justice tract after the foreclosure by the Bank

of Ashland, the Court cannot find any specific assignment of GCC's chose in action. The only express assignment of a chose in action is the Bank of Ashland's assignment to Guy Gibbons of its right to collect on the deficiency judgment. In light of GCC's vehement challenge to the Gibbons' motion to file an intervening complaint in bankruptcy court, it is doubtful that GCC would have voluntarily relinquished its chose of action against Tenneco. This lawsuit is an important asset that could be used to pay the creditors of GCC. One obligation of GCC that remains to be satisfied is the payment of civil penalties to the Kentucky Department of Natural Resources for the failure to complete reclamation of strip mining operations.

The bankruptcy court and the plaintiffs are mistaken to think of the "coal clause" as a covenant that is somehow permanently attached to the unmined coal beneath the pipeline. The "coal clause" is simply a contractual right to receive payment for the value of the coal if a landowner should trigger the coal clause by showing a bona fide intent to mine the coal. It is the opinion of the Court that the best evidence of this intent is the obtaining of mining permits to mine all coal that can be mined but for the gas pipeline. When GCC obtained a mining permit for 13 acres and conducted mining operations to remove *only* the Princess No. 3 seam of coal, it triggered the "coal clause" for the purposes of the Princess No. 3 seam of coal adjacent to the 13 acres that could not be mined but for the presence of the pipeline.

At the time GCC triggered the "coal clause" in 1981 and 1982, Tenneco had a corresponding duty to pay for the value of the coal adjacent to the 13 acres that could not be mined but for the pipeline. Consequently, Tenneco breached the covenant when it refused to pay GCC for the coal. The time of this breach cannot be set with exactness. However, in any event, Tenneco had breached its duty under the "coal clause" by the time this action was filed by GCC on December 1, 1982. This date is well before the date that the Gibbons acquired the Justice tract on September 28, 1984.

It is also the opinion of the Court that the right to be paid for the value of the coal has not been fully extinguished by the actions of GCC. The Gibbons can still obtain mining permits for the remainder of the property adjacent to the pipeline and recover for any coal that was not triggered by the actions of GCC. This would include a mining permit to mine the Tom Cooper and Fire Clay seams that were not mined by GCC and any other seams that would be commercially practical to mine in light of current technology. If blasting should be necessary to remove the coal, then the Gibbons could also recover for the value of the coal within 500 feet of the pipeline. This right under the covenant still runs with the land because no breach has occurred. The *Gibbons* have not yet triggered, for themselves, the "coal clause" for the remainder of coal. The corresponding duty of Tenneco to pay for the coal is similarly at rest.

The language of the "coal clause" does not expressly state the necessity of obtaining mining permits or conducting mining operations for the seams of coal that are intended to be triggered under the covenant. However, under Kentucky law commercial mining cannot be conducted without first obtaining a mining permit. KRS 350.060. Although plaintiffs' counsel attempted to argue at trial that no permit is needed to mine coal for household purposes, the parties clearly intended the covenant to apply to the commercial mining of coal. The landowners did not bring this action with the intention of recovering the value of coal that can be used for household purposes and Tenneco has not argued that this clause should be limited to non-commercial uses of coal.

The extension of this reasoning to the seams of coal actually mined and to the areas adjacent to the permitted areas is a logical application of the underlying requirement for a bona fide intent to mine the coal. The landowners might argue that some areas adjacent to the pipeline do not contain coal in sufficient quantities to conduct mining operations. If this is true, then the landowners would only need to obtain permits and mine those areas that

could be mined but for the pipeline. For example, any areas on the east side of the pipeline that could not be mined because of the closeness of the pipeline to the property line could be recovered by obtaining permits and conducting mining operations on the west side of the pipeline. On the other hand, the absence of any commercially minable coal in areas adjacent to the pipeline may be an indication that the coal beneath the pipeline is of little or no economic value.

As a matter of equity, the Gibbons cannot now assert that they should be paid for the value of *all* the coal beneath the pipeline when the coal clause was triggered by GCC and breached by Tenneco during GCC's ownership of the Justice tract. Even if the Gibbons were the real parties in interest, it is clear to this Court that GCC intended to mine the covenant rather than the coal. The jury was allowed to consider the issue of whether the actions of GCC was a "put-up deal". The jury evidently found that GCC exhibited a bona fide intent to mine the coal. However, GCC showed an intent to mine only the Princess No. 3 seam adjacent to a relatively small portion of the pipeline. Therefore, GCC's chose in action should be confined to the parameters set forth in this opinion. By utilizing these guidelines, Tenneco and GCC should be able to readily ascertain the tonnage of the coal triggered by GCC's mining operations.

In any subsequent trial before the bankruptcy court, GCC should be limited to recovery for only the coal that it showed a bona fide intent to mine in 1981–1982. This would include only the Princess No. 3 seam in areas adjacent to the permitted areas and within the 100 foot right-of-way.[7] By

failing to obtain permits to conduct blasting or mine the Tom Cooper and Fire Clay seams of coal, GCC showed no present intent to mine these seams or to fall within the Kentucky regulation prohibiting blasting closer than 500 feet to a pipeline. GCC should also be allowed to recover for the Princess No. 3 seam of coal on the east side of the pipeline that is adjacent to the permitted areas on the west side and which cannot be commercially mined because of the presence of the pipeline and the closeness of the property line.

Further, should the plaintiffs obtain mining permits and conduct mining operations adjacent to the pipeline in areas that were not triggered by the actions of GCC, Tenneco would have a duty to pay for the value of the coal triggered in a manner consistent with this opinion.

■ An additional issue raised at trial and in the defendant's motion is the meaning of "current fair value" in the "coal clause". Tenneco asserts that this has reference to the value in 1950 when the Justices signed the agreement. As justification for this opinion, Tenneco analogized this action to several condemnation cases. *See, e.g., Commonwealth v. Begley,* 261 Ky. 812, 88 S.W.2d 920 (1935). However, in this action the date of valuation is set by contract and clearly the parties intended that "current" refer to the date when the landowner exhibited a bona fide intent to mine the coal. Tenneco cannot argue on one hand that the obtaining of mining permits is a condition precedent to recovery and then argue on the other hand that the parties intended 1950 to be the relevant date for setting the value of the coal. Ten-

---

7. The "coal clause" does not define the width of the area that is necessary for the "proper support and protection" of the pipeline. GCC attempted to resolve this problem by writing a letter to Tenneco asking for the dimensions of this area. However, Tenneco did not respond to the letter. Clearly, Tenneco was in the horns of a dilemma. If it stated that such an area should be of considerable width, Tenneco would have to pay for more coal. On the other hand, if Tenneco had responded that only a few feet were necessary, the pipeline might be damaged. From the testimony at trial, it is evident that the 100 feet width of the right of way is probably

suitable for the proper support and protection of the pipeline absent the conducting of any blasting. Tenneco indirectly defined this area by requiring a 100 foot right of way in the 1976 Partial Release of Easement. If a larger area is needed for the proper support of the pipeline, then Tenneco may present evidence as to this larger area at a subsequent trial or it may simply write a letter to all landowners declaring the larger dimensions. In light of the inherent danger of explosion of a high-pressure gas pipeline, future triers of fact would be skeptical if Tenneco determined that mining operations could take place in an area closer to the pipeline.

neco could have chosen to condemn the property, but it chose not to do so. It cannot now use this error in judgment to dilute the effect of the coal clause.[8]

Clearly, an ambiguity exists in the language "current fair value." It could easily relate to the fair value in 1950 at the time the contract was signed. On the other hand, the coal clause relates to a time in the future, i.e., the mining of coal, wherein Tenneco ".... agrees to pay and the undersigned agrees to accept the current fair value as payment.....". It is not difficult for the court to infer that had the agreement been more definitive and included 1950 as the value date—there would have been no agreement. Too, the court has pondered Tenneco's position had the fair value of coal been *lower* in price than the 1950 levels. The point is that the language employed in the contract gives it room to argue both ways and this is why the rule of construction goes against them here. Upon representations of counsel at the trial, Tenneco was the drafter of the agreement and the ambiguous term, "current fair value" will be construed against it and will refer to market value at the time the coal in question was mined, or at the time when any coal is hereafter mined. *Cleveland Wrecking Co. v. Struck Construction Co., et al.,* 41 F.Supp. 67 (W.D.Ky. 1941); *Southern Bell Telephone & Tel. Co. v. Chappelle,* 415 S.W.2d 826 (Ky.1967).

There is a practical reason why this result is reached. The covenant in question will continue well into the next century and perhaps beyond that. From this point on, fair value as it existed in 1950 will become increasingly more difficult to prove. And it will always be subject to proof.

## MOTION FOR NEW TRIAL

Although the defendant is entitled to judgment n. o. v., Rule 50(c) requires a conditional ruling on the motion for new trial should the judgment be reversed or vacated. Because of the Court's failure to instruct the jury as to the guidelines discussed above, a new trial would be necessary so that the jury could properly determine the tonnage of coal triggered by the activities of GCC. However, a new trial would be necessary only if the Gibbons are found to be the real parties in interest or if a specific assignment of GCC's chose in action was made to the Gibbons.

In addition, the defendant raised numerous other grounds for a new trial. One of the grounds is the fact that the amount of damages is unsupported by the evidence. In light of the guidelines stated in this opinion and my failure to instruct the jury accordingly, the verdict is not supported by the evidence and a new trial would be necessary.

Further, additional comment is necessary on another issue that the defendant emphasized in its reply. Some testimony revealed that GCC may have mined as close as 18 feet to the pipeline at one point. Because the plaintiffs were unable to provide even an estimate on the amount of coal removed within the 100 foot right-of-way, Tenneco states that the jury verdict is based on pure speculation. *Roadway v. Express, Inc. v. Don Stohlman & Associates, Inc.,* 436 S.W.2d 63 (Ky.1968). Apparently, Tenneco believes that the plaintiffs bear the burden of proof on this issue.

The exact dimensions of the right-of-way are 75 feet on one side of the pipeline and 25 feet on the opposite side for a total of 100 feet. If the coal had been removed on the 25 foot side, then GCC strayed over the right-of-way for a distance of only seven feet. In any event, in light of the limited mining operations conducted by GCC and the testimony at trial, only an insignificant amount of coal was removed from the right-of-way area. Moreover, the jury was specifically instructed to deduct from their calculation of the tonnage the amount of coal, if any, removed by GCC from the right-of-way area.

---

**8.** The plaintiffs attempted to define "current fair value" as the value of the actual tonnage of coal beneath the pipeline. However, their recovery was limited to the prevailing royalty rate for coal in the Greenup County area during 1981–

**82.** This decision is supported by case law as a situation similar to an innocent trespass. *See, e.g., Hughett v. Caldwell,* 313 Ky. 85, 230 S.W.2d 92 (1950).

Tenneco could have provided evidence on this issue through the testimony of an expert witness who had examined the Justice tract. Although such expert may not have been able to state with exactness the amount of coal removed, he should have been able to determine if the right-of-way area had been disturbed by the mining of coal necessary for the support of the pipeline. Part of the problem in defining the area needed for the proper support of the pipeline was caused by the failure of Tenneco to define this area in writing. Finally, if Tenneco really believed that GCC removed coal that was necessary for the support of the pipeline, it could have filed a counterclaim against GCC for its breach of the "coal clause" in removing such coal. As a result, this issue, in and of itself, would not justify a new trial.

The following reasons support the need for a new trial should the decision to grant the defendant's judgment n. o. v. be reversed or vacated:

1. Failure to instruct the jury as to the limitation of the area necessary for the "proper support and protection" of the pipeline to 100 feet.

2. Failure to instruct the jury that only coal adjacent to the permitted areas could be considered for purposes of calculating the total tonnage of coal triggered by the activities of GCC.

## CONCLUSION

In light of the Court's determination that as a matter of law the Gibbons are not the real parties in interest, oral argument on the defendant's motion is unnecessary and would not be in the interest of judicial economy and the defendant's motion for oral argument is overruled.

When Gibbons Construction Company, Inc. bought the Justice tract in 1979, it discovered that the deed contained a covenant allowing the recovery of unmined coal if mining operations were conducted on the property. GCC chose to mine this covenant by obtaining mining permits for 13 acres and conducting a relatively small mining operation. At the time GCC obtained the mining permits and began mining operations in 1981 and 1982, GCC triggered the "coal clause" and Tenneco's corresponding duty to pay for the unmined coal that could not be mined but for the pipeline. When Tenneco refused to pay GCC for the coal, Tenneco breached the covenant. Consequently, the right to collect for the value of the coal triggered by the operations of GCC became a *chose in action* that ceased to run with the land.

GCC sued Tenneco for breach of the covenant. Although a chose in action may be specifically assigned, GCC at no time made any assignment to Guy and Carolyn Gibbons or any other party. After GCC filed a bankruptcy petition and this action was transferred to bankruptcy court, the Gibbons moved to file an intervening complaint. The bankruptcy court correctly found that the "coal clause" is a covenant that runs with the land. However, the bankruptcy court was mistaken as to the chose in action triggered by the mining activities of GCC. The Gibbons should not have been allowed to intervene or assert a claim for a cause of action that they never owned.

Although Tenneco breached the covenant and it became a chose in action, it was only a partial breach and the right to be paid for the value of the coal has not been fully extinguished. The Gibbons can still obtain mining permits for the remainder of the property adjacent to the pipeline and recover for any coal that was not triggered by the actions of GCC. This would include a mining permit to mine one or all seams of coal adjacent to the entire length of the pipeline. If blasting should be necessary to remove the coal, then the Gibbons could also recover for the value of the coal within 500 feet (or such safe distances allowed by law) of the pipeline. This right under the covenant still runs with the land because no breach has occurred. The Gibbons have not yet triggered the "coal clause" for the remainder of coal.

Moreover, the Gibbons can trigger the remainder of the covenant by exhibiting a bona fide intent to mine the remainder of land adjacent to the pipeline. The best evidence of this intent is the obtaining of

mining permits to mine whatever coal that can be mined but for the pipeline and these permits will reflect any intent to mine with or without the use of explosives. By obtaining mining permits and conducting mining operations, the Gibbons will have clearly triggered the covenant and Tenneco will be obliged to respond by paying for the coal that cannot be mined.

For the reasons stated above, the defendant's motion for judgment n. o. v. is SUSTAINED and the defendant's motion for new trial is conditionally sustained in the event that the judgment n. o. v. should be reversed or vacated.