Filed 6/30/14  Country Hills v. Automobile Club of Southern California CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| COUNTRY HILLS DB, LLC, | B246289 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. KC061520) |
| v. | |
| AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County.  Salvatore T. Sirna, Judge.  Affirmed.

The Rodarti Group, Josef M. Rodarti, Amanda E. Manahan, and Keith C. Davis, for Plaintiff and Appellant.

Manuel Dominguez and Steven J. Dawson for Defendants and Respondents.

_____

Country Hills DB, LLC (Country Hills) appeals from a judgment entered against it, dismissing its action against the Automobile Club of Southern California (the Auto Club) and the Interinsurance Exchange of the Automobile Club (the Exchange; collectively AAA). Country Hills sued AAA in an attempt to collect common area maintenance costs allegedly accrued while Country Hills owned property upon which it and AAA had mutual, reciprocal easements. AAA successfully sought summary judgment on the ground that Country Hills no longer owned the property in question and therefore could not enforce a covenant benefitting the property. AAA also asserted there was no breach of any relevant covenant while Country Hills maintained an ownership interest in the property. Country Hills challenges the trial court's order granting summary judgment, as well as a subsequent order awarding AAA attorney fees and costs. We affirm the judgment and order.

## FACTUAL AND PROCEDURAL BACKGROUND

In June 1995, Landsing Pacific Fund, Inc. (Landsing) and the Exchange executed and recorded a Grant of Easements and Declaration of Covenants Conditions and Restrictions (Declaration). Landsing owned the Country Hills Town Center in the city of Diamond Bar (the Landsing Property). The Exchange owned an adjacent piece of property. Under the Declaration, Landsing and the Exchange entered into a mutual grant of easements, allowing reciprocal parking and ingress and egress easements to benefit both properties. Section 4.1 of the Declaration concerned maintenance of the common area of the properties. Landsing agreed to maintain the common area, while the Exchange agreed to pay a percentage of the common area maintenance costs (CAM costs). On a monthly basis, the Exchange was to pay Landsing a prorated portion of the Exchange's annual share of CAM costs, as estimated by Landsing, along with an administrative fee. The monthly amount was subject to reasonable adjustment by Landsing, based on its experience and anticipated costs and expenses. In addition, section 4.1(b)(iii) provided:

2

"Within four (4) months following the end of each calendar year, or more frequently if Landsing so elects, Landsing shall furnish AAA with a statement ("Reconciliation Statement") covering the calendar year just expired, showing the total of said CAM costs for said calendar year, and the amount of AAA's share of same for said calendar year, and the payments made by AAA with respect to same for such calendar year. If AAA's share of said CAM costs exceeded the sum of the payments so made by AAA, AAA shall pay the deficiency to Landsing within thirty (30) days after receipt of said statement. If said payments exceed AAA's share of the total of said CAM costs, Landsing shall credit the excess against payments thereafter due to Landsing as AAA's share of such CAM costs for the following calendar year."[1]

Late fees and interest were to be assessed on late payments.

After a series of transfers, Country Hills came to own the Landsing property in 2003. In 2007, Country Hills began a major renovation project of the Landsing property, which was completed in early 2008. On or around May 2, 2008, Country Hills sent the Auto Club a 2007 year-end CAM reconciliation statement. The letter stated: "The reconciliation includes Auto Club's pro-rata share of actual expenses, site work improvements, and repairs and replacement of the parking lot, lights, curbs, fountain, and landscaping. Due to the additional site work improvements listed . . . there is a balance due of $289,992.20." Under the terms of the Declaration, AAA was required to make the CAM reconciliation payment within 30 days of receipt of this letter.[2]

On May 5, 2008, Country Hills completed a sale of the Landsing property to a separate entity, Country Hills Holdings (CHH).

On June 22, 2009, Country Hills sent the Auto Club another demand regarding "2007 and 2008 Expense and Capital Reimbursement Request," in which it asserted AAA owed Country Hills a total of $1,150,608.17.

In June 2011, Country Hills filed suit against the Auto Club, alleging one cause of action for breach of contract. Country Hills asserted the Auto Club owed $950,015.88 in unpaid CAM costs, as well as $47,500.79 in late fees, and $114,001.90 in administration

---

[1] In the Declaration, the Exchange was referred to as "AAA."

[2] The record does not indicate when AAA received the letter. However, as the letter was dated May 2, 2008, payment would not have been due before June 1, 2008.

3

fees. Following a successful demurrer, Country Hills filed a first amended complaint, naming both the Auto Club and the Exchange as defendants.

AAA moved for summary judgment. AAA argued Country Hills had no standing to pursue its claims because it sold the Landsing property with no reservation of rights, and the obligation to pay CAM costs was a covenant that runs with the land. AAA also contended the Auto Club was not a party to the Declaration and could not be held liable for breaching it. Country Hills asserted it had reserved its rights to recover CAM costs in the purchase and sale agreement it entered with the new owner of the property, CHH. It further argued the Auto Club and the Exchange had ignored their separate identities before and throughout the litigation, so AAA had not shown as a matter of law that the Auto Club was not liable as a party to the Declaration.

The trial court granted the motion for summary judgment. It concluded Country Hills lacked standing because the easement and provisions of the Declaration run with the land. The court noted that even if the rights afforded by the Declaration could be assigned, there was no breach of the CAM costs covenant until after Country Hills sold the property. It further found the Auto Club met its burden to show it was an improper party. The court later awarded AAA attorney fees and costs. Country Hills timely appealed.

## DISCUSSION

### I. The Trial Court Did Not Err in Granting Summary Judgment

" ' " 'A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); [citation].) The moving party bears the burden of showing the court that the plaintiff "has not established, and cannot reasonably expect to establish," ' the elements of his or her cause of action. [Citation.]" [Citation.] We review the trial court's decision de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party.' [Citation.]" (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 705.)

4

The relevant facts in this case were largely undisputed. The summary judgment motion turned on a single question: Without a current ownership interest in the Landsing property, could Country Hills enforce the covenant requiring AAA's payment of CAM costs? Country Hills contends it could properly sue AAA because its right to recover the CAM costs was not a covenant running with the land, but was instead a "chose in action," personal to it. We find no error in the trial court's conclusion that Country Hills could not enforce the covenant.

**A. Country Hills Did Not Have a Chose in Action Based on AAA's Failure to Pay Excess CAM Costs**

Country Hills's first argument is that the covenant-based obligation to pay CAM costs, and the right to recover such costs, is not a covenant running with the land, but is instead a chose in action that, absent an assignment, does not transfer with a conveyance of the Landsing property.[3] According to Country Hills, as soon as it incurred CAM costs, AAA was obligated to pay its share of such costs, and Country Hills's right to enforce that obligation was personal to it. On this theory, irrespective of Country Hills's lack of ownership interest at the time a year-end reconciliation payment was due, it could sue AAA for its portion of the CAM costs Country Hills incurred in 2007 and 2008. We disagree with the contention that the CAM costs covenant does not run with the land.

In general, obligations created by a set of covenants, conditions and restrictions affecting real property run with the land. "To run with the land, a covenant must touch and concern land, which means it must affect the parties as owners of the particular estates in land or relate to the use of land. [Citation.] 'The primary characteristic of a covenant running with the land is that both liability upon it and enforceability of it pass with the transfer of the estate. The benefits or burdens pass by implication of law rather than under principles of contract.' [Citation.]" (*Self v. Sharafi* (2013) 220 Cal.App.4th 483, 488.) Courts have found that covenants requiring the payment of assessments or

---

[3]     Civil Code section 953 defines a "thing in action" (also referred to as a "chose in action") as "a right to recover money or other personal property by a judicial proceeding."

5

fees for the maintenance of common areas are covenants that run with the land.  (*Cerro de Alcala Homeowners Assn. v. Burns* (1985) 169 Cal.App.3d Supp. 1, 4 [maintenance assessments were covenants running with the land]; *Anthony v. Brea Glenbrook Club* (1976) 58 Cal.App.3d 506, 508, 511-512 [covenant requiring membership in club and payment of membership dues and assessments ran with land]; see also 8 Miller & Starr, Cal. Real Estate (3d ed. 2009) § 24:3, p. 24-13; *Riverton Community Ass'n v. Myers* (N.Y.A.D. 1992) 584 N.Y.S.2d 368, 369; *Inwood North Homeowner's Ass'n v. Harris* (Tex. 1987) 736 S.W.2d 632, 635; *Stephens Co. v. Lisk* (N.C. 1954) 82 S.E.2d 99, 102-103; 20 Am.Jur.2d Covenants,  Etc. § 28.)

In addition, here, the Declaration explicitly provides that the Landsing property and the Exchange's property are to be sold, conveyed, and otherwise used "subject to the covenants, conditions, restrictions and easements set forth herein. . . . The . . . covenants, conditions and restrictions contained herein shall be binding upon and inure to the benefit of the parties hereto and all successive owners of the Landsing property and the AAA Property, are for the direct, mutual and reciprocal benefit of the Landsing Property and the AAA Property, shall create mutual equitable servitude upon each of the other property, shall create reciprocal rights and obligations between Landsing and AAA, and privity of contract and estate between all grantees of the Landsing Property and AAA Property, their heirs, representatives, successors and assigns, shall operate in each case as covenants for the benefit of the other property and shall for all purposes run with the land as to the Landsing Property and the AAA Property pursuant to California Civil Code section 1468." [4]

---

[4]    Civil Code section 1468 provides:  "Each covenant, made by an owner of land with the owner of other land or made by a grantor of land with the grantee of land conveyed, or made by the grantee of land conveyed with the grantor thereof, to do or refrain from doing some act on his own land, which doing or refraining is expressed to be for the benefit of the land of the covenantee, runs with both the land owned by or granted to the covenantor and the land owned by or granted to the covenantee and shall, except as provided by Section 1466, or as specifically provided in the instrument creating such covenant, and notwithstanding the provisions of Section 1465, benefit or be binding upon

6

Regarding enforcement, the Declaration provides that Landsing and AAA, identified as "Owners" are the only entities or persons entitled to bring an action under the Declaration or to enforce its rights and remedies. The provision continues: "The promises, undertakings, restrictions, covenants, conditions, agreements, rights, easements and privileges arising under this Declaration . . . shall not be enforced by legal or equitable proceedings or otherwise by any person whatsoever (such as lessees or occupants of the buildings and structures which may now or later be constructed upon the Parcels) except Owners, and their successors and assigns."

In light of the nature of the condition requiring the payment of CAM costs, and the plain language of the Declaration, we must reject the argument that the CAM costs covenant does not run with the land.

It is well established in California that covenants running with the land can generally only be enforced by one with a current ownership interest in the property. (*B.C.E. Development, Inc. v. Smith* (1989) 215 Cal.App.3d 1142, 1146; *Kent v. Koch* (1958) 166 Cal.App.2d 579, 584.) "One who no longer owns land in a development subject to reciprocal restrictions cannot enforce them, absent showing the original covenanting parties intended to allow enforcement by one who is not a landowner." (*Farber v. Bay View Terrace Homeowners Assn.* (2006) 141 Cal.App.4th 1007, 1011.)

each successive owner, during his ownership, of any portion of such land affected thereby and upon each person having any interest therein derived through any owner thereof where all of the following requirements are met: (a) The land of the covenantor which is to be affected by such covenants, and the land of covenantee to be benefited, are particularly described in the instrument containing such covenants; (b) Such successive owners of the land are in such instrument expressed to be bound thereby for the benefit of the land owned by, granted by, or granted to the covenantee; (c) Each such act relates to the use, repair, maintenance or improvement of, or payment of taxes and assessments on, such land or some part thereof, or if the land owned by or granted to each consists of undivided interests in the same parcel or parcels, the suspension of the right of partition or sale in lieu of partition for a period which is reasonable in relation to the purpose of the covenant; (d) The instrument containing such covenants is recorded in the office of the recorder of each county in which such land or some part thereof is situated."

7

AAA asserts this is the end of the story. Country Hills counters that some authorities distinguish between a covenant running with the land, and the breach of such a covenant, when assessing who may enforce a covenant-related obligation. For example, Country Hills relies on American Jurisprudence Second on covenants, which explains: "Real covenants are enforceable by all subsequent assignees of the original covenantee. If a covenant that runs with the land is breached during an assignee's ownership of the premises, the assignee may sue for the damages sustained thereby. [¶] However, at common law, a covenant which runs with the land becomes, immediately upon its breach, a nonassignable chose in action upon which no one can sue, except the grantee then in possession, or entitled to the possession, or his or her personal representative. Under modern rules rights of action arising from breach of contract are assignable, and in most jurisdictions may be enforced by the assignee in his or her own name." (20 Am.Jur.2d Covenants, Etc. § 47, citing *Fudge v. Hogge* (1959 Tex. Civ. App.) 323 S.W.2d 663, *Chesapeake & O.R. Co. v. Willis* (1958 Va.) 105 S.E.2d 833.)

Country Hills acknowledges its inability to find a California case expressly applying this principle. (But see *Platner v. Vincent* (1921) 187 Cal. 443, 449 [covenant for quiet enjoyment runs with the land, but where breach occurs "while the original grantee still holds the interest originally conveyed to him by the grantor, the claim, assuming that it arises from the fact that the broken covenant runs with the land, becomes a *chose in action* . . . and enforceable in any jurisdiction in which the grantor may be found . . . ."].) We also note that some cases applying the proposition concern situations extremely dissimilar to the case before us. (See e.g., *Chesapeake & O.R. Co. v. Willis, supra,* 105 S.E.2d 833 [covenant to build fence; railroad sought specific performance of the covenant although it had been breached nearly 100 years earlier; court concluded that once breached, the covenant no longer ran with the land and was personal to those who had breached; enforcement of covenant barred by statute of limitations].)[5]

---

[5] Despite the absence of on point California cases, we note distinguishing obligations created by a covenant and a breach of a covenant is consistent with California

8

Yet, even assuming the "broken covenant" principle is generally applicable here, it remains clear that Country Hills could not establish the elements of a viable cause of action as a matter of law. As explained in American Jurisprudence Second, the authority Country Hills primarily relies upon, a covenant which runs with the land becomes a chose in action *upon the breach of the covenant*. A breach of contract, including a covenant, occurs only when performance is due and the party obligated to perform fails to do so. (See 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 849 [when performance is due, it is the failure to perform that constitutes the breach]; 20 Am.Jur.2d Covenants, Etc. § 44 ["Generally, a cause of action upon a covenant accrues as in other cases at the moment of the default on the part of the covenantor."].) Here, the Declaration required AAA to pay any CAM costs deficiency within 30 days after receipt of a year-end reconciliation statement. The obligation to pay a portion of the CAM costs was a continuing one that ran with the land. Even if Country Hills retained its right to seek damages from a breach occurring during its ownership of the Landsing property, there had to be just that—a breach occurring during its ownership. There was no such breach because AAA's performance was not due until after Country Hills had divested itself of its ownership interest in the benefitted property.

_____

Civil Code section 1466, which provides: "No one, merely by reason of having acquired an estate subject to a covenant running with the land, is liable for a breach of the covenant before he acquired the estate, or after he has parted with it or ceased to enjoy its benefits." *Liability* for the breach of a covenant does not transfer with the land. (See 8 Miller & Starr, *supra*, § 24:27, p. 24-103.) Several out-of-state cases applying the principle that a broken covenant becomes a chose in action have done so as a rationale for refusing to allow a successor owner to sue for a breach of a covenant occurring before the successor had an ownership interest in the affected property. (See *Fudge v. Hogge, supra,* 323 S.W.2d at p. 667 [successor owners could not sue for breaches of covenants occurring prior to their ownership]; *Wallace v. Paulus Bros. Packing Co.* (1951 Or.) 231 P.2d 417, 569 [covenant to keep in repair runs with the land, but cause of action for breach of covenant does not; successor owners could not sue for damages for breach of covenant that occurred before they had an ownership interest in the property]; *Stout v. Blackwell Oil & Gas Co.* (Okl. 1938) 80 P.2d 942, 944 [assuming covenant to drill oil well ran with land, it did so only until time expired for act to be performed; it then became a chose in action].)

9

The out-of-state cases Country Hills relies upon do not suggest a different result. In *Shively Ctr. v. Tex. Roadhouse of Dixie Highway* (Ky. Ct. App. Mar. 9, 2012, Nos. 2011-CA-000076-MR) 2012 WL 752037 (*Shively*), the beneficiary of a parking easement never paid agreed upon "parking charges" to the property owner. After the property was sold, the new owner sought to collect unpaid parking charges that had accrued before it received an ownership interest in the property. (*Id.* at *1.) The easement beneficiary contended the new owner had no right to enforce the covenant for the past due parking charges. In its analysis, the court relied on the general principle that "the right to recover damages arising from the breach of a covenant running with the land is a 'chose in action.' [Citation.] Though the covenant runs with the land, a chose in action arising from the breach of the covenant does not run with the land. [Citation.]" (*Id.* at p. *3.)

The court accordingly determined the new owner of the property could not, absent an assignment, enforce the covenant requiring the payment of parking charges to collect charges accrued prior to its ownership of the property. The case merely adheres to the general principle that once a covenant is breached, it is the right to recover damages arising from the breach that is an assignable chose in action.[6] There is no indication that the parking charges were accrued, but not actually due until after the new owner purchased the building. Thus, nothing in *Shively* indicates a previous owner may enforce a covenant running with the land when the covenant was breached only *after* the owner sold the underlying property.

---

[6]    As AAA notes, *Shively* is an unpublished state court decision from a Kentucky appellate court. Under Kentucky rules, unpublished cases are not to be cited or used as binding precedent in any other case in any Kentucky court. However, "unpublished Kentucky appellate decisions, rendered after January 1, 2003, may be cited for consideration by the court if there is no published opinion that would adequately address the issue before the court." (Kentucky R. Civ. Proc. 76.28(4)(c).) We need not, and do not, rely on *Shively*, as it is helpful in this case only to the extent it repeats a proposition stated elsewhere.

Similarly, *Gibbons v. Tenneco, Inc.* (E.D.Ky. 1988) 710 F.Supp. 643, concerned a gas pipeline easement on a particular piece of land. Under the terms of the easement, the beneficiary was required to compensate the landowner for foregoing coal mining activities near the pipeline. (*Id.* at pp. 644-645.) After the property was sold, the successor landowners sued the beneficiary of the easement. The court concluded the successor owners could not assert a claim for breaches of the covenant occurring before they owned the property. The court explained that while the provision at issue was "a covenant that runs with land, upon the breach of a covenant, it becomes a 'chose in action' that does *not* run with the land." (*Id.* at p. 648.) But the court reasoned it was the *breach* of the covenant that became a chose in action. Because there was no assignment of the chose in action, the right to enforce the breached covenant remained with the owner of the land at the time of the breach, not the successor landowners.[7] (*Id.* at p. 649.) The court noted the provision was "triggered" by the activities of the previous owner and was "breached" by the refusal of the defendant to honor the provision while the previous owner owned the land. Although the record did not reveal exactly when the breach occurred, the court noted it was well before the transfer of the land to the successor landowners now attempting to recover. (*Ibid.*) In contrast, although the breach in this case was also a refusal to pay, it occurred well after the transfer of the land away from Country Hills. Thus, *Gibbons* fails to meaningfully support Country Hills's position.

The California cases appellant cites also fail to support its argument. For example, *Jasmine Networks Inc. v. Superior Court* (2009) 180 Cal.App.4th 980, concerned a company's right to continue prosecuting an action for misappropriation of trade secrets, even after it sold its rights in the underlying trade secret at issue. In that case, at the time

---

[7] The court noted: "[T]he plaintiffs are mistaken to think of the 'coal clause' as a covenant that is somehow permanently attached to the unmined coal beneath the pipeline. The 'coal clause' is simply a contractual right to receive payment for the value of the coal if a landowner should trigger the coal clause by showing a bona fide intent to mine the coal." (*Gibbons v. Tenneco, Inc., supra*, 710 F.Supp. at p. 649.)

11

of the sale, the injury had already occurred, the cause of action had accrued, and a lawsuit by the original owner was already pending. Moreover, the case concerned intellectual property, not real property, and a tort, rather than a breach of covenant running with the land. These differences render *Jasmine* unhelpful in this case.

Similarly, in *Vaughn v. Dame Construction Co.* (1990) 223 Cal.App.3d 144, the court considered whether a condominium owner who was damaged by defective construction, and who filed suit while owning the property, lost standing after selling the unit during the pendency of the suit. The court concluded the plaintiff's "*cause of action for damages as a result of injury to the property, which was fully vested in plaintiff at the time of the injury, is personal property –not real property . . . The right to recover damages for injury to property, being personal property, may be assigned or transferred . . . . There is no authority . . . for the proposition that the transfer of the real property automatically transfers plaintiff's personal cause of action.*" (*Id.* at pp. 148-149, fn. omitted.)

Even assuming the *Vaughn* analysis applies to injuries to property arising out of a breach of contract rather than a tort, the fact remains that here, unlike in *Vaughn*, Country Hills divested itself of ownership in the real property before any cause of action relating to a failure to pay CAM costs accrued or was fully vested. At the time escrow closed on the Landsing property, Country Hills did not yet have a cause of action for damages arising out of AAA's breach of the covenant to pay CAM costs, much less a pending suit. " 'A cause of action accrues at the moment the party who owns it is entitled to bring and prosecute an action thereon. [Citations.]' [Citations.] That is said to occur when '. . . events have developed to a point where plaintiff is entitled to a legal remedy, not merely a symbolic judgment such as an award of nominal damages.' [Citation.]" (*Keru Investments, Inc. v. Cube Co.* (1998) 63 Cal.App.4th 1412, 1423.) At the time of the sale of the Landsing property, there existed only an obligation benefitting the property. While Country Hills had demanded payment, at least with respect to the 2007 excess CAM costs, AAA's deadline to pay was weeks away. Country Hills could not

12

have sought legal relief at that point because there had yet to be a breach. Absent a breach, the obligation continued to run with the land.[8]

Country Hills argues that denying it the ability to recoup already expended CAM costs, based on the timing of its demand for payment, results in an unjust windfall to AAA. Yet, Country Hills has offered no basis in law or the Declaration that would allow it to enforce the covenant following its sale of the benefited property. In *B.C.E. Development, Inc. v. Smith, supra,* 215 Cal.App.4th 1142, the court explained that the "talisman for enforcement [of a covenant affecting real property] is not the rigid requirement of retention of an interest in land, but rests instead upon a determination of the *intention* of those creating the covenant."[9] (*Id.* at p. 1147.) But here, nothing in the Declaration evinces an intent of the parties to convert the obligation to pay excess CAM costs, or the right to receive CAM costs, into a personal obligation or right upon a transfer of the ownership of either property affected.

Indeed, the Declaration as a whole demonstrates otherwise. Courts generally treat recorded declarations of covenants, conditions, and restrictions as contracts. (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development* (2012) 55 Cal.4th 223, 239-240.) "We interpret a contract de novo if the interpretation does not turn on the credibility of

---

[8]    See e.g., 52 C.J.S. (2014) Landlord & Tenant § 545 ["However, since the right to enforce a covenant that runs with the land that is not yet breached passes to the purchaser with the beneficial ownership of the land upon the execution of a binding contract for sale, the purchaser thereafter is entitled to recover damages for a breach by a tenant of the covenant to surrender premises in good condition at the end of the lease term notwithstanding that the breach occurs while the sale contract is still executory."]

[9]    Similarly, the Restatement (Third) of Property: Servitudes notes, in a section on the duration of the original parties' and successors' obligations and enjoyment rights: "The rationale for the rule that a party is entitled to enjoy the benefit of a servitude that runs with the land only so long as the party owns the land is that it reflects the probable intent of the parties. The same rationale underlies the rule stated in § 4.5, that the benefit of an interest intended to run with land is not ordinarily severable from the land. Although the parties have the power to create severable benefits that can be retained by the original beneficiaries after transfer of the property, the situation is sufficiently unusual that the language of the instrument would probably have reflected their intent."

13

extrinsic evidence, as here." (*Windsor Pacific LLC v. Samwood Co., Inc.* (2013) 213 Cal.App.4th 263, 273.) "Our goal in interpreting a contract is to give effect to the mutual intention of the contracting parties at the time the contract was formed. (Civ. Code, § 1636.) We ascertain that intention solely from the written contract if possible, but also consider the circumstances under which the contract was made and the matter to which it relates. (*Id.,* §§ 1639, 1647.) We consider the contract as a whole and interpret its language in context so as to give effect to each provision, rather than interpret contractual language in isolation. (*Id.,* § 1641.) We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. (*Id.,* § 1644.) If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs. (*Id.,* § 1638.)" (*Id.* at p. 274.)

As noted above, section 8.1 of the Declaration provides that all conditions and covenants in the agreement are to run with the land. Section 7.1 limits enforcement of the Declaration's provisions to "owners" and their successors. Further, under section 4.1, if AAA's portion of the CAM costs exceeds the amount of its estimated monthly payments, it must pay the owner of the Landsing property the deficiency. But if AAA's monthly payments exceed the actual amount of CAM costs for the previous calendar year, it receives a *credit* on future payments, not a cash reimbursement. This suggests that if a year-end reconciliation results in credits to AAA, but the Landsing property has changed hands, a new owner is required to honor the credits to AAA, despite the fact that the new owner did not expend the funds the prior year in maintaining common areas, and that the credits to AAA will count against funds the new owner will expend in the current year. Even though it was the previous owner who received excessive monthly CAM payments, it seems apparent that once divested of ownership, the original owner cannot personally "credit" AAA for future payments.[10] If the original covenanting parties

---

[10]  Similarly, if the AAA property changes hands during the year, but before any year-end reconciliation is settled, the Declaration contains no provision allowing AAA to

14

intended rights relating to the CAM costs to be severable from the land and personal to the owner of the Landsing property at the time CAM costs are incurred or accrued, we would expect that the Declaration would have provided for assessment, apportionment, or collection of excess CAM costs or credits in the event of a transfer of the Landsing property. Moreover, the provision restricting enforcement to "owners" conflicts with this interpretation of the Declaration.

In sum, the covenant to pay CAM costs could not be breached until AAA's performance was due and it failed to perform. That moment did not arrive until after Country Hills had transferred its entire ownership interest in the property to a new owner. The right to enforce the covenant not yet breached passed to the new owner with the beneficial ownership of the property. (See *Cote v. A.J. Bayless Markets, Inc.* (Ariz. Ct. App. 1981) 626 P.2d 602 [covenant to repair and surrender in good condition could not be breached until the expiration of lease, after landlord sold the property; original owner not entitled to recover damages for breach of that covenant; rejecting argument that new owner would be unjustly enriched].) Country Hills could not prevail on its breach of contract claim.

## B. Country Hills Did Not Reserve Any Right to Collect the Reconciliation Payment

Country Hills contends that even if the timing of the sale of the Landsing property divested it of the right to collect the reconciliation payment, it reserved this right in the purchase agreement with CHH, in a sort of reverse assignment. However, we agree with the trial court that the purchase agreement does not support this interpretation.

The purchase agreement between Country Hills and CHH does not explicitly mention AAA or the Declaration. Section 6.7.4 of the agreement sets forth provisions governing a reconciling of common area maintenance charges, taxes, and other charges, but only with respect to tenants. Under this provision, Country Hills and CHH agreed to

receive any form of reimbursement for the excess payments it made during the previous calendar year, before it sold its interest in the property.

reconcile all such charges for Country Hills's period of ownership. To the extent Country Hills's total expenses exceeded the total reimbursements it received from tenants under leases, CHH agreed to pay Country Hills "such excess after such excess is received by [CHH] from the tenants." The agreement further provides that CHH "shall be solely responsible for completing, in accordance with the Leases, any year-end reconciliation of Additional Rent for calendar year 2008." Under section 6.7.9, the parties agreed: "[F]ollowing the Closing Date, Seller [Country Hills] may, at its election, pursue any claims for money damages that Seller may have against tenants at the Property with respect to such Delinquent Rent or pre-Closing Rent; provided however that under no circumstances will Seller be entitled to threaten eviction or dispossession of, or seek the bankruptcy of any tenant of the Property."

Country Hills contends these provisions reserved its right to collect accrued but not yet due common area maintenance fees from AAA. The plain language of the agreement refutes this contention. AAA was not a tenant. The agreement does not define tenant, and under no common sense of the term was AAA a tenant of the Landsing property. It was the owner of an adjacent property. Irrespective of the agreement's broad definition of "leases,"[11] AAA simply was not a "tenant," and the purchase agreement cannot be read as reserving Country Hills's rights with respect to AAA under the Declaration.

We see no basis for a conclusion that, after conveying its ownership interest in the property to CHH, Country Hills still had the right to enforce a covenant benefitting the Landsing property. The covenant itself, and its benefits and burdens, ran with the land. There was no breach of the covenant while Country Hills maintained an ownership interest in the property. And there is no evidence that Country Hills entered into any contractual agreement, with any relevant party, to preserve an interest sufficient to allow it to sue AAA for unpaid CAM costs that were due only after the order of the Landsing

---

[11] The agreement defines "leases" as "all leases, rental agreements or other agreements (including all amendments or modifications thereto) which are in writing and entitle any person to the occupancy or use of any portion of the Property."

16

property.  The trial court properly granted summary judgment to AAA on Country Hills's breach of contract claim.

## II.    Attorney Fee Issues

### A.  Background

Following the trial court's order granting summary judgment, AAA filed a motion seeking $113,040 in attorney fees on behalf of both defendants.  Section 7.5 of the Declaration provides that "[i]n any litigation arising out of this Declaration or its interpretation, the prevailing Owner shall be entitled to recover its costs and damages, including the reasonable attorneys' fees actually incurred by the prevailing Owner." Two in-house attorneys for the Auto Club, Steven Dawson and Manuel Dominguez, represented both defendants in the litigation.  In support of the attorney fee motion, each attorney provided a declaration offering a general summary of the work completed, as well as a more detailed breakdown of time spent, organized by date and a one-line description of the task completed.  Dawson declared that between June 2011 and January 2013, he spent 71.7 hours in defending the action.[12]  Dominguez declared that between June 2012 and November 2012, he spent 180.10 hours on the case.

Country Hills opposed the attorney fee motion.  It argued the court should deny AAA fees because the Auto Club had engaged in the unauthorized practice of law; an award calculated at market rates would allow AAA to engage in unethical fee splitting; the Exchange was not entitled to fees because it did not employ the attorneys; and AAA had not provided sufficient evidence for a fee award.  The trial court rejected Country Hills's arguments and awarded AAA attorney fees, using the lodestar method.  The court selected an hourly rate of $350, $100 less than AAA's requested rate.  The court also rejected 46.3 of the hours requested and awarded $71,715 in fees.

---

[12]    A small portion of this time was a prospective estimate to account for additional litigation of the attorney fee motion.

**B. Discussion**

In general, the trial court has broad discretion in ruling on an attorney fee motion, particularly with respect to the reasonableness of the fees requested. (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 581.) We review such determinations for an abuse of discretion. (*In re Tobacco Cases I* (2013) 216 Cal.App.4th 570, 587.) However, we independently review rulings regarding a party's entitlement to fees, to the extent such determinations concern the application of law to undisputed facts, or the interpretation of a statute. (*Wohlgemuth v. Caterpillar Inc.* (2012) 207 Cal.App.4th 1252, 1258.)

**1. An Award of Fees did not Represent or Condone the Unauthorized Practice of Law**

Country Hills contends it was improper for in-house counsel of the Auto Club to represent the Exchange. Country Hills asserts the Auto Club could not allow or direct its own in-house counsel to represent the Exchange, a separate entity, without engaging in the unauthorized practice of law.

Initially we note Country Hills has cited no authority for the proposition that the trial court must, or should, relieve a losing party from paying contract-based attorney fees when the opposing, prevailing party's attorney has violated rules of professional conduct.[13] However, assuming without deciding the trial court could have properly

---

[13] In the lower court, Country Hills cited *Pringle v. La Chapelle* (1999) 73 Cal.App.4th 1000, which failed to support its argument. In *Pringle*, which concerned a fee dispute between an attorney and client, the court explained: "La Chapelle is correct in suggesting that an attorney's breach of a rule of professional conduct may negate an attorney's claim for fees. However, La Chapelle has not cited a case standing for the proposition that a violation of a rule of professional conduct automatically precludes an attorney from obtaining fees. Rules 3–310 and 3–600 do not so provide. . . . La Chapelle has not cited a case in which the individual defendant, who executed the fee contract for himself as well as for the corporation, is not obligated to pay fees. [¶] Further, the Supreme Court case addressing the issue, and upon which all others are based (*Clark v. Millsap* (1926) 197 Cal. 765, [242 P. 918]), seems to suggest there must be a serious violation of the attorney's responsibilities before an attorney who violates an ethical rule is required to forfeit fees." (*Id.* at pp. 1005-1006, fn. omitted.) Unlike *Pringle*, this case

18

denied AAA's motion for attorney fees to be paid by Country Hills, based on the Auto Club's alleged unauthorized practice of law, we find no merit in the substance of Country Hills's contention. Notably, on appeal, Country Hills offers no direct support for its unauthorized practice argument. Legal authorities considering similar, or related issues, all undercut Country Hills's position.

We first consider several relevant propositions. Although historically California courts concluded corporations could not employ counsel to represent third parties (*People v. Merchants Protective Corp.* (1922) 189 Cal. 531, 538-539), there is no longer any such blanket proscription. (*Frye v. Tenderloin Housing Clinic, Inc.* (2006) 38 Cal.4th 23, 38-39 (*Frye*) [exceptions for professional for-profit corporations, nonprofit lawyer referral services, nonprofit group legal service plans, and nonprofit corporate practice, such as legal aid].) A corporation may employ in-house counsel to represent its interests. (*Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1411 (*Gafcon*).) One attorney may represent multiple clients, so long as the client's interests do not conflict, or any potential or actual conflicts are disclosed and the clients provide informed, written consent. (*Roush v. Seagate Technology, LLC* (2007) 150 Cal.App.4th 210, 223; Cal. Rule of Prof. C. 3-310(c).) And, an attorney may accept compensation from a third party for representing a client, so as long as certain ethical safeguards are met. (Rule of Prof. C. 3-310(f) [there can be no interference with the attorney's independence of professional judgment or the attorney-client relationship; information relating to the representation must be protected; and the attorney generally must obtain the client's written consent].)

---

before us does not even present a dispute between attorney and client; instead it is the opposing party that is seeking to evade a contract-based obligation to pay attorney fees by belatedly contending the prevailing parties engaged in ethical violations. (Cf. *People ex rel. Herrera v. Stender* (2012) 212 Cal.App.4th 614, 632 [violation of a rule of professional conduct cannot, in and of itself, form the basis of a damages award].)

Country Hills does not challenge the above principles. Instead, it asserts only that the Auto Club's in-house attorneys' representation of an entity related to the Auto Club constituted the unauthorized practice of law by the Auto Club. This argument has been rejected in an analogous context. In *Gafcon, supra,* the court rejected the argument that an insurer's use of in-house counsel to represent an insured constituted the unauthorized practice of law by the insurance company. The court's conclusion was consistent with a State Bar opinion on the same subject. (*Id.* at pp. 1406, 1413.) The court explained: "We are not bound by an ethics opinion, and we need not adopt it in full for our holding in this case. It is sufficient here to recognize that (1) an insurance company has a direct pecuniary interest in the underlying third party action against its insured and (2) having such an interest, it is entitled to have counsel represent its own interests as well as those of its insured, as long as their interests are aligned. In the present situation, the insurer is representing its own interests through licensed attorneys who also happen to be its employees. Counsel's status as a salaried employee of the insurer does not inherently create a temptation to violate or disregard ethical rules." (*Id.* at p. 1414, fn. omitted.)

The *Gafcon* court declined to "render an advisory opinion purporting to extend to all circumstances in which an insurance company utilizes employee attorneys to represent its insured in third party actions." (*Gafcon, supra,* at p. 1415.) But the court explained that the insurer's use of an employee attorney to represent an insured in that case implicated none of the policy concerns underlying the prohibition on unauthorized practice. The evidence established the insurer did not influence or interfere with the designated attorney's professional judgment, and did not limit or restrict the attorney's ability to represent the insured in the underlying litigation. The attorney did not participate in any aspect of the insurance coverage issue. Further, there was no evidence the insurer directed or controlled the attorney's representation in any way.

Similarly, in this case, there was no basis for the trial court to deny AAA attorney fees on the ground that the Auto Club had engaged in the unauthorized practice of law. Although they purported to be separate entities in the litigation, the interests of the Auto Club and the Exchange appeared to be completely aligned, such that joint representation

20

was reasonable and created no obvious conflict of client interests. As in *Gafcon,* the Auto Club could have its counsel represent its own interests and those of an affiliated company, since their interests were aligned. There was no indication the Auto Club was in the business of employing counsel for other companies. (See *Merchants Protective Corp., supra,* 189 Cal. 531.)

There is nothing inherently ethically suspect in two related entities being represented by the same counsel. (See Prof. Conduct Rule 3-600, discussion [rule not intended to prohibit attorneys from representing both an organization and other parties connected with it].) And, in *Frye, supra,* 38 Cal.4th at p. 50, the California Supreme Court explained: "Our dominant concern when we adopted the general rule prohibiting corporations from employing attorneys to represent third parties was to protect clients from conflicts of interest that we viewed as inevitably flowing from the profit motive with which corporations are imbued." In this case, Country Hills has identified no apparent conflict of interest raised by the Auto Club's in-house attorneys representing both the Auto Club and the Exchange, in litigation in which they were related defendants, being sued on a single legal theory, and in which they successfully advanced a unified defense. As is clear in *Gafcon* and *Frye*, the general rule prohibiting corporations from employing attorneys to represent third parties, as set forth in *Merchants Protective Corp.*, is not a blanket rule. The reasoning of *Gafcon* is applicable here to describe a situation in which "'the attorney has two clients whose primary, overlapping and common interest is the speedy and successful resolution of the claim and litigation.'" (*Gafcon, supra,* at p. 1407.)

In the narrow context of the successful defendants' post-judgment attorney fee motion, when the trial court has observed the in-house attorneys representing both organizations with aligned interests, the court properly rejected the unauthorized practice argument as a basis to deny AAA attorney fees.

21

## 2. The Trial Court Had No Basis to Conclude an Attorney-Fee Award Would Amount to Illegal Fee Splitting

Country Hills argues that because the Auto Club employed Dawson and Dominguez, yet the attorney fee motion sought fees on behalf of both the Auto Club and the Exchange, any attorney fees the Auto Club shared with the Exchange, and any fees the Exchange received, would constitute impermissible fee splitting, in violation of California Rule of Professional Conduct Rule 1-320(A).

This argument misconstrues Rule 1-320, which governs an *attorney's* financial arrangements with *non-lawyers*. Under the rule, "[n]either a member [of the State Bar] nor a law firm shall directly or indirectly share legal fees with a person who is not a lawyer[.]" In this case, under the Declaration, the prevailing *party* was entitled to an award of attorney fees. As such, the court's order awarded fees to AAA, not to the attorneys. Rule 1-320 does not govern how parties who are jointly represented decide to apportion a contract-based award of attorney fees awarded directly to them. Indeed, Country Hills cites no case or other legal authority for the proposition that because of the joint representation that took place in this case, an award of attorney fees to the successful litigants implicates the ethical prohibition against fee splitting between lawyers and non-lawyers.

Similarly, we disagree that the trial court's use of a lodestar method to calculate the attorney-fee award permitted improper fee splitting.

Country Hills cites the American Bar Association Commission of Ethics and Professional Responsibility Formal Opinion 95-392 to support its contention. However, the opinion does not aid Country Hills's argument. With respect to court-awarded fees to a corporate employer at amounts greater than the employer's actual cost of the services, the opinion states: "Under certain fee-shifting arrangements the courts award legal fees to the parties. Under others the fee award is made to the lawyers. Because in the former case the fee is directed to the corporation, no ethical question is raised; the lawyer is not placed in a position in which she is being asked to share fees with a nonlawyer. However, it is in the latter situation, where the lawyer is awarded the fee and the

corporation seeks from the lawyer some or all of the fee award, that ethical questions are raised to which this portion of the opinion is addressed." In this case, the attorney fee award was made to the successful defendants, not the lawyers. The concerns raised in opinion 95-392 regarding unethical fee splitting simply do not apply here.[14]

As such, the Court of Appeals for the Seventh Circuit's reasoning in *Central States v. Central Cartage Co.* (7th Cir. 1996) 76 F.3d 114 (*Central States*), is persuasive. *Central States* concerned an attorney fee award to the prevailing party—a pension fund— in an ERISA action. The pension fund was represented by "staff counsel." (*Id.* at p. 115.) The losing employer argued an attorney fee award could not exceed the fund's out-of-pocket costs such as the attorneys' salaries and actual expenses of its legal counsel's office. (*Ibid.*) The fund asserted the fee award should be calculated at market rates for similar legal work. The employer contended that calculating the award at market rates might subsidize the fund's other business, which could conflict with "the ethical principle that attorneys may not share their fees with nonlawyers." (*Id.* at p. 115.)

The Court of Appeals noted the law in that circuit was that organizations including lawyers and nonlawyers may recover fees at the market rate, even if the organization obtained legal services through employment contracts. The court then explained: "Whatever one can say about the policy behind the rule against fee-splitting, or the policy behind the rule permitting the recovery of fees, or the effect of a separate legal-costs

---

[14]     The ABA opinion takes the position that when a lawyer remits to his or her for-profit corporate employer an award of attorney fees that exceeds the costs of the representation to the company, this amounts to unauthorized practice of law by the company and unethical fee sharing. The opinion reasons that in such situations, the corporation has the opportunity to profit from its lawyers, and thus has an incentive to interfere with the lawyers' handling of matters and their professional judgment. The opinion also concludes that under the model ethics rules, "a corporation cannot hire one or more lawyers, pay them salaries, make their services available generally to others, and directly receive the fees for the lawyers' work." The scenario considered, however, concerns the "renting out" of in-house counsel for a fee. The opinion does not address in-house counsel's joint representation of the employer corporation—a defendant in the litigation—and a co-defendant that is an affiliated entity with identical interests in the litigation.

fund, is beside the point. Most fee-shifting statutes, including ERISA, direct the award to the *litigant* rather than the lawyer. The litigant may compromise the claim over the lawyer's objection, or may elect not to petition for fees. . . . If the victorious litigant owns the money representing the market value of the legal fees, and may pocket the cash without remitting a cent to the lawyer-who may have agreed to work for less, or for free-it is hard to see how there can be a fee-splitting objection. The money is not the lawyer's to start with. A contract between lawyer and client may call for a particular distribution, may even assign the award to the lawyer, but how the litigant allocates the money between its legal budget and other endeavors is none of the court's business (provided it keeps its contracts). It is similarly irrelevant whether the award is based on a fee-shifting statute . . . or a penalty provision . . . ; the litigant owns the award in either case, which overcomes all fee-splitting objections."[15]  (*Central States, supra,* at p. 116.)

Similarly, in *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1097 (*PLCM*), our high court concluded a trial court does not abuse its discretion when calculating an attorney fee award for the services of in-house counsel based on the lodestar method; the trial court need not adopt a "cost-plus" approach. And, as noted above, the award here was an award to the litigants, not the attorneys. Country Hills points out that in *PLCM*, in a concurring and dissenting opinion, Justice Chin disagreed that allowing the lodestar method, rather than a cost-plus approach, was appropriate. He noted that some state and federal courts have concluded a corporation that profits from its legal department by recovering fees in excess of the actual costs of the legal services may violate ethical rules proscribing fee splitting and the unauthorized practice of law, particularly if those fees go to a corporation or union's general treasury, rather than directly to, and only to, a legal department. (*Id.* at p. 1106.)

---

**15**    The *Central States* court also explained that if in-house attorneys make a "gift" to their employer by working for wages lower than those they could secure at a law firm, the value of that gift belongs to the employing entity, not an adversary in litigation. (*Id.* at p. 117.)

However, we fail to see that these concerns are implicated in this case, even with a lodestar calculation of fees, and no assurance that the fees would be sequestered in AAA's legal department. First, as explained above, the award of attorney fees in this case was to AAA, not to the attorneys. There was no basis for the trial court to assume there would be any fee splitting between the attorneys and the companies. The prohibition against fee splitting only concerns the splitting of fees between lawyers and non-lawyers. Second, cases such as those involving unions that have provided their in-house legal services to their members in litigation with a third party are factually distinct from this case. In those cases, the entity providing the legal services—the union for example—is not the client, and functions only to provide an attorney for the client. The entity itself may have no direct stake in the litigation. Some courts have reasoned that, in those situations, allowing a lay entity to receive a profitable attorney fee award might run afoul of the fee splitting prohibition's aim to "prevent encouraging persons who are not authorized to practice law to engage in the unauthorized practice of law." (*Curran v. Department of Treasury* (9th Cir. 1986) 805 F.2d 1406, 1408; see *Rodriguez v. City of New York* (E.D.N.Y. 2010) 721 F.Supp.2d 148, [court rejected stipulation proposing to award attorney fees directly to union for in-house counsel's services representing member employee plaintiffs; union was not a party to the litigation or a law firm.]

In contrast, here, the Auto Club was a defendant and Country Hills's adversary. Its in-house counsel represented and defended its interests, and the identical interests of the Exchange. An attorney fee award to AAA was an award to the litigants—the clients—not an unrelated entity that merely provided legal services. While one policy underlying the prohibition against fee splitting is "to avoid instances of control over litigation by a lay person more interested in his or her own profit than the client's fate," in this case, the "lay person" was one of two jointly represented clients in the litigation. While the Auto Club employed the attorneys who also represented the Exchange, the two entities' interests were aligned as joint defendants in the action. There was no basis for the trial court to conclude Dawson and Dominguez's joint representation of the Auto

25

Club and the Exchange implicated ethical rules against fee splitting between lawyers and non-lawyers.  There was even less reason for the trial court to conclude that, as a result of improper fee-splitting, Country Hills should be relieved of its contract-based obligation to pay attorney fees.

We find no error in the trial court's use of the lodestar method to calculate the award of attorney fees in this case.

### 3.  The Award of Attorney Fees to the Exchange Was Proper

Country Hills asserts the trial court erred in awarding attorney fees to the Exchange because it did not incur fees, since it was not Dominguez's and Dawson's employer.

We find no error.  Attorney fees may be "incurred" even in the absence of evidence that the client itself paid the fees.  Indeed, as recognized in *International Billing Services, Inc. v. Emigh* (2000) 84 Cal.App.4th 1175 (*International Billing*), "the claim 'that a losing party . . . should not have to pay attorney fees if the prevailing party did not, in fact, have to pay' them 'has been rejected numerous times.'  [Citation.]"  (*Id.* at p. 1193; see also *Nemecek & Cole v. Horn* (2012) 208 Cal.App.4th 641, 651-652.)  Here, the Exchange was entitled to attorney fees as the prevailing party under the Declaration. It was subject to attorney fees, as it required representation to defend itself against Country Hills's claims.  (*International Billing, supra,* at p. 1192.)  Country Hills was not entitled to avoid its obligation to pay attorney fees due to the Exchange's ability to secure representation from attorneys it did not directly employ.  (See *Lolley v. Campbell* (2002) 28 Cal.4th 367, 373-375; *Beverly Hills Properties v. Marcolino* (1990) 221 Cal.App.3d.Supp. 7, 11-12; *Staples v. Hoefke* (1987) 189 Cal.App.3d 1397, 1409-1410.)

### 4.  The Trial Court Did Not Err in Accepting AAA's Documentation of Hours Expended and in Determining the Relevant Market Rate

Country Hills argues the trial court erred in concluding AAA met its burden to support the claim for attorney fees.  Specifically, Country Hills asserts AAA's documentation of the hours expended was insufficient and should have been rejected.

Country Hills further contends AAA failed to provide sufficient evidence of the prevailing market rate. We disagree.

" 'It is well established that the determination of what constitutes reasonable attorney fees is committed to the discretion of the trial court . . . . [Citations.] The value of legal services performed in a case is a matter in which the trial court has its own expertise. [Citation.] The trial court may make its own determination of the value of the services contrary to, or without the necessity for, expert testimony. [Citations.] The trial court makes its determination after consideration of a number of factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case.' [Citation.]" (*PLCM, supra,* 22 Cal.4th at p. 1096.)

It may have been preferable for AAA's counsel to maintain or submit contemporaneous records of hours spent on the case. (See *PLCM, supra,* 22 Cal.4th at p. 1096, fn. 4 [encouraging in-house counsel to maintain contemporaneous records of hours spent to facilitate accurate calculation of the lodestar].) However, the failure to do so did not invalidate the request for attorney fees. (*City of Colton v. Singletary* (2012) 206 Cal.App.4th 751, 786 [attorney declaration and work filed with court are sufficient evidence for court to determine amount of fees to be awarded].) Dominguez and Dawson reconstructed their time and provided an account of the time spent each day, including the amount of time spent on tasks that day. As in *PLCM,* where the in-house counsel also failed to keep contemporaneous billing records, "the superior court was familiar with the quality of the services performed and the amount of time devoted to the case." (*PLCM, supra,* 22 Cal.4th at p. 1096.) While "block billing" may pose a problem when a prevailing party is only entitled to attorney fees on some claims litigated, (see e.g., *Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 689), that was not the case here. Moreover, the trial court reviewed the evidence submitted and reduced fees it found to be excessive. (*City of Colton, supra,* 206 Cal.App.4th at p. 786.) "The award was not clearly wrong; the superior court did not abuse its discretion." (*PLCM, supra,* 22 Cal.4th at p. 1096; *Nemecek & Cole v. Horn, supra,* 208 Cal.App.4th at p. 652; *Weber v.*

27

*Langholz* (1995) 39 Cal.App.4th 1578, 1587 [absence of time records and billing statements did not deprive trial court of substantial evidence to support attorney fee award].)

Country Hills also asserts AAA failed to offer "credible evidence" of the prevailing market rate for attorneys for similar legal work. However, no particular form of evidence is required to establish an appropriate hourly rate for the lodestar calculation. Indeed, the trial court may rely on its own expertise to determine the value of the attorney's services. (*Cordero-Sacks v. Housing Authority of City of Los Angeles* (2011) 200 Cal.App.4th 1267, 1286; *Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 1009 (*Heritage Pacific*) [court may rely on its own knowledge and familiarity with the legal market in setting a reasonable hourly rate].) Here, Dominguez and Dawson offered declarations attesting to their hourly rates in previous years when they were in private practice, and their knowledge of law firm rates in the greater Los Angeles area and Orange County. Country Hills challenged the rate, but offered no contrary evidence. (*Heritage Pacific, supra,* 215 Cal.App.4th at pp. 1009-1010.) Moreover, the trial court reduced AAA's requested rate from $450 per hour to $350. The trial court acted within its discretion in selecting $350 per hour as the prevailing market rate for the lodestar calculation.

## III. Costs: The Trial Court Did Not Err in Allowing AAA's Errata Amending the Memorandum of Costs

Finally, Country Hills asserts the trial court erred in accepting AAA's "Notice of Errata," which indicated a previously-filed Memorandum of Costs was intended to be filed on behalf of both the Auto Club and the Exchange, even though only the Auto Club was listed as the filing party. Country Hills contends the Exchange waived its right to recover costs by failing to file a timely request. We find no abuse of discretion in the trial court's acceptance of the memorandum of costs on behalf of both defendants.

In general, a party must file a memorandum of costs within 15 days after a party serves notice of entry of judgment. (Cal. Rules of Court, rule 3.1700(a)(1).) However, "[i]n the absence of prejudice, the trial court has broad discretion in allowing relief on

28

grounds of inadvertence from a failure to timely file a cost bill." (*Pollard v. Saxe & Yolles Dev. Co.* (1974) 12 Cal.3d 374, 381.)  Here, once Country Hills argued the failure to include the Exchange on the memorandum of costs was a waiver of its right to seek costs, AAA responded that the omission was inadvertent.  In all previous proceedings and filings, the Auto Club and the Exchange acted jointly, including in filing a motion for attorney fees.  AAA contended the omission of "et al.," or the name of the Exchange on the judicial council form memorandum of costs, was an inadvertent typographical error.  Since there were no additional costs included in the amended memorandum, we fail to discern any prejudice to Country Hills from the "late" filing.  In light of the trial court's discretion to allow relief from a failure to file a timely cost bill, we find no abuse of discretion.[16]

---

[16]    In *Russell v. Trans Pacific Group* (1993) 19 Cal.App.4th 1717, 1729, the court interpreted *Pollard* as standing for the proposition that parties seeking to file a late costs bill may seek relief under Code of Civil Procedure section 473, subdivision (b), for mistake, inadvertence, surprise, or excusable neglect.  (But see *Lee v. Wells Fargo Bank* (2001) 88 Cal.App.4th 1187, 1199 [expressing uncertainty that *Pollard* should be read "so narrowly."].)  Even if this is the correct interpretation of the holding in *Pollard*, the trial court here could reasonably construe AAA's filings as seeking relief under section 473, subdivision (b), and would not have abused its discretion in granting such relief. The opposition to the motion to tax costs explained the Exchange was omitted from the memorandum of costs inadvertently; the opposition was accompanied by a notice of errata and amended memorandum of costs; and it was further accompanied by a declaration from Dawson explaining counsel did not intend to file the memorandum of costs on behalf of the Auto Club alone; bills and invoices attached to the memorandum were for services incurred by both entities; and it was a typographical error that the words "et al." were not included after the Auto Club's name on the memorandum.

## DISPOSITION

The trial court judgment and order are affirmed.  Respondents shall recover their costs on appeal.

BIGELOW, P. J.

We concur:

RUBIN, J.

FLIER, J.